**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

IN RE:

| | | |
|---|---|---|
| **SUSAN H. ESHLEMAN,** | : | Bankruptcy No. 05-39306 BM |
| | : | |
| **Debtor** | : | Chapter 7 |
| ***************************** | | |
| **SUSAN H. ESHLEMAN,** | : | |
| | : | |
| **Movant** | : | |
| | : | |
| v. | : | Doc. # 38: Objection To Claim No. 3 |
| | : | |
| **MASONIC VILLAGE AT SEWICKLEY,** | : | |
| a/k/a **VALLEY CARE MASONIC** | : | |
| **CENTER,** | : | |
| | : | |
| **Respondent** | : | |

Appearances:   Mary Bower Sheats, Esq. for Debtor
Quinn A. Johnson, Esq. for Masonic Village at Sewickley

## MEMORANDUM OPINION

Debtor Susan Eshleman has objected to a claim filed by Masonic Village at Sewickley, also known as Valley Care Masonic Center ("VCMC"), for charges incurred for the care of her husband while he resided at its facility.

VCMC maintains that debtor is liable for the charges under the law of contracts as well as the so-called "doctrine of necessaries".

Debtor's objection will be sustained. VCMC's claim will be disallowed in its entirety.

## FACTS

Debtor is a registered nurse. She presently is a school nurse. She is or was married to Joseph Eshleman, a physician. They no longer live together.

After suffering a stroke, Joseph Eshleman executed a general power of attorney on November 29, 2001, wherein he designated debtor as his attorney-in-fact. Among other things, he granted debtor the specific power to engage in banking transactions on his behalf, including all actions concerning his bank accounts. He also authorized debtor to transact his business affairs "of any kind", including paying his debts.

VCMC operates a skilled nursing care unit and a personal care unit. Joseph Eshleman became a resident of its skilled nursing unit on January 4, 2002. The parties to the residence agreement, which was executed immediately prior to his admission, were VCMC, Joseph Eshleman as resident and debtor as responsible party.

Joseph Eshleman agreed, among other things, to pay all fees and charges incurred in the course of his care while he resided at VCMC. Payment was to be made on a monthly basis, one month in advance, by any of various methods. He could, for instance, pay the charges himself or could appoint someone to be his attorney-in-fact to pay the charges for him.

VCMC did not consider Joseph Eshleman to be capable of communicating as a result of his stroke and did not require him to sign the residence agreement. It instead required debtor to sign it as a "responsible party".

As responsible party, debtor agreed to assume Joseph Eshleman's responsibility of paying the charges incurred if his physician found him to be medically incapable of understanding his responsibilities, if he was adjudged to be incompetent under the law, or if he exhibited a "communication barrier".

Joseph Eshleman was a resident of the skilled nursing care unit from January 4, 2002, until July 24, 2002, when his medical condition had improved and he was moved to VCMC's personal care unit. Joseph Eshleman and VCMC executed a document captioned "Admission Agreement For Personal Care Residents" at that time. The signatories to the agreement were VCMC and Joseph Eshleman. Debtor did not sign the agreement and was not named as a party thereto.

Joseph Eshleman agreed to pay VCMC a specified amount per day on a monthly basis for his care while he was in the personal care unit. The agreement made no mention of an attorney-in-fact or a responsible party who would pay the charges incurred during his stay in the personal care unit. Although debtor was not named as a party to the agreement, she was identified as "designated payor".

Joseph Eshleman remained a resident of the personal care unit until October 26, 2002. The record does not indicate where he went upon leaving the personal care unit.

Unpaid charges for his stay at VCMC's facility totaled $24,312.50. The amount due for his care while he resided at the skilled nursing unit was $14,808.75. The amount due for his care while he resided at the personal care unit was $9,503.75.

Debtor commenced a divorce proceeding against Joseph Eshleman on July 1, 2003. Little occurred in the divorce proceeding until September 26, 2006, when Joseph Eshleman executed and filed a document captioned "Affidavit of Consent". The contents of the affidavit are not part of the record in this case.

Debtor claimed that she and Joseph Eshleman were divorced as of September 26, 2006. The docket of the divorce proceeding, however, does not indicate that a divorce decree ever issued. As far as can be determined, debtor and Joseph Eshleman are still married.

VCMC commenced a proceeding against Joseph Eshleman and debtor in state court to recover the unpaid charges owed for Joseph Eshleman's care while he resided at VCMC's facility.

The complaint consisted of five counts. Counts I and II were against Joseph Eshleman only and stated causes of action for breach of contract and unjust enrichment, respectively. Counts III through V were against debtor. Counts III and IV stated causes of action for breach on contract and tortious interference of contract, respectively. Count V stated a cause of action brought pursuant to the so-called "doctrine of necessaries".

An arbitration hearing was held on VCMC's complaint on March 15, 2003. Debtor appeared at the hearing but Joseph Eshleman did not. At the conclusion of the hearing, the arbitration panel issued an award in favor of debtor and against VCMC and in favor of VCMC and against Joseph Eshleman. VCMC subsequently appealed the award as it pertained to debtor.

On October 15, 2005, before VCMC's appeal was decided, debtor filed a voluntary chapter 7 bankruptcy petition, which automatically stayed VCMC's appeal. The bankruptcy schedules disclosed assets with a total declared value of $403,228.42 and liabilities totaling $314,351.28. VCMC was identified as having a general unsecured claim.

VCMC subsequently filed a proof of claim in debtor's bankruptcy case in the amount of $24,312.50 pursuant to § 501 of the Bankruptcy Code. The claim was for "services rendered" while Joseph Eshleman resided at its facility. An evidentiary hearing on debtor's objection to the claim was held and the matter is now ready for decision.

## ANALYSIS

### – I –

A proof of claim filed pursuant to § 501 of the Bankruptcy Code "is deemed allowed, unless a party in interest objects". 11 U.S.C. § 502(a).

The burden of going forward with respect to an objection to a proof of claim lies with different parties at various stages.

The initial burden of going forward lies with the claimant, which must allege sufficient facts to support the claim. If the claimant does so, the claim is *prima facie* valid. *In re Allegheny International, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992).

The burden then shifts to the objector to negate the *prima facie* validity of the claim. The objector must produce evidence which, if believed, refutes at least one allegation that is central to the legal sufficiency of the claim. *Id.*, 954 F.2d at 173-74.

If the objector succeeds in doing this, the burden then shifts back to the claimant to prove the validity of its claim by a preponderance of the evidence. *Id.*, 954 F.2d at 174.

Whereas the burden of production shifts back and forth, the burden of persuasion does not. It lies with the claimant at all times. *Id.*

VCMC indicated at the evidentiary hearing on debtor's objection that its claim is based on two theories of recovery.

It first maintains that debtor breached the resident agreement she executed as responsible party when Joseph Eshleman was admitted as a resident to the skilled nursing unit on January 4, 2002. Debtor was obligated to pay the cost of Joseph Eshleman's care, VCMC maintains, because she agreed as responsible party to assume this obligation if Joseph Eshleman did not pay.

Alternatively, VCMC maintains that, as Joseph Eshleman's spouse, debtor is liable for the charges under the so-called "doctrine of necessaries" in effect in Pennsylvania.

Debtor does not dispute the *prima facie* validity of VCMC's claim. Attached to its claim was a copy of an in-house statement of account prepared by VCMC showing that a total of $24,312.50 was due and owing for the care of Joseph Eshleman beginning on January 4, 2002, and ending on October 26, 2002. Debtor instead came forward with testimony which, if believed, would undermine VCMC's assertion that she breached the residence agreement she had executed as responsible party.

Debtor testified, for instance, that she was not authorized to access Joseph Eshleman's checking accounts and use the funds in them to pay VCMC what Joseph Eshleman owed for his care because he had revoked the above power of attorney prior to his admission to VCMC's skilled nursing care unit.

Changing tack, debtor also testified that Joseph Eshleman had designated her as his attorney-in-fact for the sole purpose of paying the debts of his medical practice, which she did. He did not intend for her to pay for his care while at VCMC.

To take one more example, debtor testified that because it was late in the day on January 4, 2002, employees of VCMC insisted that she sign the residence agreement without affording her time to review it. Fearful that Joseph Eshleman would not be admitted to VCMC at that time, debtor testified that she hastily signed the agreement at the place pointed to by VCMC's employee without realizing that she was signing it as responsible party.

Whether debtor's testimony was credible need not detain us. Her burden of production in objecting to VCMC's proof of claim does not require us to make such a determination. It requires only that her testimony, *if credible*, would negate one (or more) of the essential elements of VCMC's cause of action for breach of contract. *In re Allegheny International*, 954 F.2d at 173-74. We are satisfied that the above testimony – or other testimony by debtor not recounted here – would, if credible, negate an essential element of the cause of action of VCMC's action for breach of contract.

## – II –

### *Breach of Contract*

For it to prevail under this theory of recovery, VCMC must demonstrate, by a preponderance of the evidence, that debtor was contractually obligated to pay the cost of Joseph Eshleman's care. We conclude that VCMC failed to meet its burden of proof with respect to this theory. Debtor was not obligated under the terms of the residence agreement to pay the cost of Joseph Eshleman's care.

It is a fundamental tenet of contract law that the intent of the parties to a contract must be ascertained and given effect. *Murphy v. Duquesne University of the Holy Ghost*, 565 Pa. 571, 590-91, 777 A.2d 418, 429 (2001). The intent of the parties to a written agreement is expressed in the writing itself. *Crawford Central School District v. Commonwealth of Pennsylvania*, 585 Pa. 131, 143, 888 A.2d 616, 623 (2005).

When the terms of a contract are clear and unambiguous, the parties' intent must be ascertained solely from the written document. *Hutchison v. Sunbeam Coal Corp*, 513 Pa. 192, 200, 519 A.2d 385, 390 (1986). Where there is an ambiguity, parol evidence may be relied upon to resolve it. *Id*.

A term is ambiguous in this context when it is amenable to different constructions and can be understood in more ways than one. *Id*. One must not assume that the words employed in a contract were chosen carelessly. *Crawford Central School District*, 585 Pa. at 143, 888 A.2d at 623.

Unless specifically defined, words employed in a written contract must be given their ordinary meaning. *Kripp v. Kripp*, 578 Pa. 82, 90, 849 A.2d 1159, 1163 (2004).

We must consider the contract in its entirety when seeking to ascertain the intent of the parties to it. *Murphy*, 565 Pa. at 591, 777 A.2d at 429. Effect must be given to all of its terms whenever possible. *Capek v. DeVito*, 564 Pa. 267, 274, 767 A. 2d 1047, 1050 (2001).

Joseph Eshleman ostensibly agreed[1] as a resident of VCMC to several things, two of which are significant here.

He agreed in the residence agreement to pay all fees and charges incurred during his care while a resident of VCMC. Payment was to be made on a monthly basis, one month in advance, in any of several ways. He could, for instance, handle his own finances if he was capable of doing so. Alternatively, he could appoint someone as his attorney-in-fact to manage his financial affairs. *Residence Agreement, § V.B.*

Joseph Eshleman also agreed that upon depletion of his assets, he would cooperate with VCMC and any public agency in making all applications and providing all necessary and appropriate information in applying for third-party payment. *Residence Agreement, § V.F.2.*

---

[1] We say "ostensibly" because the line on the signature page of the residence agreement reserved for the "resident" was left blank. Joseph Eshleman, in other words, did not personally sign the residence agreement. Moreover, debtor did not affix Joseph Eshleman's signature on that line pursuant to the power of attorney he had executed. She instead affixed her own signature on the line reserved for "responsible party". We will not address the significance of the absence of a signature on the line reserved for "resident" and instead will address whether debtor was liable as "responsible party for the costs incurred in the care of Joseph Eshleman while he was a resident at VCMC.

The critical provision of the residence agreement for present purposes is § XIII, which provided in pertinent part as follows:

> A. The resident is encouraged to execute a general, durable power of attorney to carry out the terms of this Agreement on the resident's behalf in the event of the incapacity of the resident to act on his ... own behalf ....
>
> B. The resident's attorney-in-fact or responsible party assumes the above responsibility for the resident if the resident has been found by his ... physician to be medically incapable of understanding these responsibilities, has been adjudged incompetent in accordance with the law or exhibits a communication barrier.

*Residence Agreement*, § XIII.

Debtor does not deny that neither she nor Joseph Eshleman paid the charges for his care while he was a resident of VCMC.

VCMC would have us conclude in light of the above considerations that debtor breached § XIII.B of the residence agreement and therefore is personally liable for those unpaid charges.

We do not so conclude for reasons that follow.

Section XIII.B sets forth a set of disjunctive requirements that must be satisfied for debtor to be liable for the cost of Joseph Eshleman's care: (1) Joseph Eshleman's physician found him to be medically incapable of understanding the above responsibilities; (2) he was adjudged to be incompetent under the law; or (3) he exhibited a "communication barrier". We understand this last requirement to mean that Joseph Eshleman was incapable of communicating with others.

VCMC has not demonstrated that at least one these requirements, which we take to be exhaustive, is satisfied in this case. It offered no evidence whatsoever showing that Joseph Eshleman's physician found him "medically incapable" of understanding his responsibilities arising under the residence agreement.  Also, it offered no evidence whatsoever showing that he had been adjudged to be incompetent under the law.  VCMC instead appears to have relied exclusively upon the third of the above requirements to prove its case.

As for the third requirement, the director of admissions of VCMC's skilled nursing unit testified that she evaluated Joseph Eshleman prior to his admission and concluded that he was not capable of acting on his own behalf.  We understand her to mean by this that she found Joseph Eshleman incapable of communicating with others at the time of his admission to the skilled nursing care unit.  A social worker employed by VCMC who executed the residence agreement on VCMC's behalf testified that she had debtor sign the agreement as responsible party because Joseph Eshleman was incapable of communicating with others at that time.  Their testimony concerning this matter, which was contradicted by debtor when she testified, was not persuasive.

Debtor is a registered nurse with advanced degrees in chronic nursing care and head and neurological trauma.  She testified that she was with Joseph Eshleman immediately before she signed the residence agreement as responsible party.  According to her, debtor despite his being wheelchair-bound, Joseph Eshleman was able to communicate with her and understood what was going on at that time.

The testimony of VCMC's witnesses concerning this matter was entirely conclusory. More precisely, neither of them described the specific steps they took if any, in determining on January 4, 2002, that Joseph Eshleman had a "communication barrier". If their determinations were purely impressionistic, it does not suffice in light of debtor's testimony to the contrary. We did not consider debtor's testimony to be an obvious fabrication. Without something more from VCMC's witnesses, which was not forthcoming, we are not willing to discredit debtor's testimony on this point.

We conclude in light of the foregoing considerations that debtor is *not* personally liable for the total cost of Joseph Eshleman's care while he resided at VCMC. Its assertion that she breached the residence agreement by failing to pay for his care lacks merit.

The matter does not end there. The cost of Joseph Eshleman's care during his stay at the skilled nursing care unit totaled $14,808.75 while the cost of his care during his stay at the personal care unit was $9,503.75. Even if debtor were liable for the cost of Joseph Eshleman's care while he resided at VCMC's skilled nursing care unit, she is *not* liable for the cost of his care while he resided at its personal care unit.

Upon his admission to the personal care unit on July 24, 2002, Joseph Eshleman personally signed a document captioned "Admission Agreement For Personal Care Residents". It was signed on behalf of VCMC by the director of its personal care unit. Debtor was not named as a party to the agreement and did not sign it in any capacity.

The agreement provided, however, that *debtor* would pay the cost of Joseph Eshleman's care while he resided at the personal care unit.

VCMC concedes that debtor was not a party to and did not sign the agreement of July 24, 2002, which Joseph Eshleman executed on his own behalf. VCMC asserted at the evidentiary hearing that debtor nonetheless is liable in light of the residence agreement for the cost of Joseph Eshleman's care during his stay in the personal care unit .

While VCMC did not identify the specific provision in the residence agreement upon which it relies in so asserting, it appears to rely on the following provision:

> This agreement sets forth the rights and liabilities of the parties without regard to whether the resident is initially admitted to the nursing care facility or to personal care.

*Residence Agreement*, § I.B. VCMC's apparent reliance on this provision of the residence agreement is misplaced.

For this provision to impose liability upon debtor for the cost of Joseph Eshleman's care while he was a resident of the personal care unit, § XIII.B of the residence agreement would have to apply. We previously determined that § XIII.B does not operate to impose a responsibility upon debtor to pay the cost of Joseph Eshleman's care while he was a resident at VCMC.

– II –

***Doctrine of Necessaries***

As an alternative to its assertion that debtor breached the above residence agreement and therefore is liable for the cost of Joseph Eshleman's care, VCMC asserts that debtor is liable under the so-called "doctrine of necessaries".

The present version of the doctrine is codified as follows:

> In all cases where debts are contracted for necessaries by either spouse for the support and maintenance of the family, it shall be lawful for the creditor in this case to institute suit against the husband and wife for the price of such necessaries and, after obtaining a judgment, have an execution against the spouse contracting the debt alone; and, if no property of that spouse is found, execution may be levied upon and satisfied out of the separate property of the other spouse.

23 Pa. C. S. A. § 4102 (Purdon's 2001).

This statutory provision relates to a legitimate state interest in safeguarding the support and maintenance of families and the individual members thereof. It is intended to ensure, among other things, the provision of needed medical services to married persons and recognizes that marriage involves shared wealth, expenses, rights and duties. *Porter v. Karivalis*, 718 A.2d 823, 826 (Pa. Super. 1998). Section 4102 furthers this state interest by making the spouse who incurred the debt primarily liable and the spouse who did not secondarily liable. *Id*.

The doctrine of necessaries originated as a common-law principle and over time has undergone several statutory modifications. Under the common law, the husband was solely liable for the family's necessities. It was presumed that, as the breadwinner, the

husband was in a better position than the wife to provide these necessities. *Swidzinski v. Schultz*, 342 Pa. Super. 422, 425, 493 A.2d 93, 95 (1985). The marriage relationship was viewed as a contractual one, with the husband contributing monetary support and the wife contributing domestic services. *Id.*

Erosion of the common-law rule began with the enactment of 23 Pa. C.S.A. § 116, which provided as follows:

> In all cases where debts may be contracted for the support of the family of any married woman, it shall be lawful for the creditor in such case to institute suit against the husband and wife for the price of such necessaries, and, after obtaining a judgment, have an execution against the husband alone; and if no property of such husband be found, ... an alias execution may be levied upon and satisfied out of the separate property of the wife ....

This statutory provision did away with the principle that the husband was solely liable for such debts and replaced it with the principle that both spouses could be made liable. *Swidzinski*, 342 Pa. Super. at 425, 493 A.2d at 95. The husband, however, remained *primarily* liable for the family's necessities. *Id.* Section 116 made the wife's separate assets available to satisfy the judgment, but only if the husband's separate assets were not sufficient for that purpose. She was, in other words, *secondarily* liable to the judgment creditor.

Section 116 was repealed and replaced by § 4102 to comply with the Equal Rights Amendment to the Pennsylvania Constitution, Art. I, § 28. Among other things, the Equal Rights Amendment required a gender-neutral burden of providing support for

one's family.  A wife, in other words, could be liable for the cost of necessaries provided to her husband. *U.S. v. O'Neill*, 478 F.Supp. 852, 854 (E.D. Pa. 1979).

Section 4102 does not dispense with the primary-secondary concept of liability found in § 116.  It instead makes the spouse, regardless of gender, who contracted for the necessaries primarily liable for the obligation while making the non-contracting spouse secondarily liable. *Zebley v. Olexa*, 317 B.R. 290, 297 (Bankr. W.D. Pa. 2004), *aff'd*, 476 F.3d 177 (3d Cir. 2007).

For VCMC to prevail in this instance pursuant to § 4102, it must establish at a minimum: (1) that it obtained a judgment against Joseph Eshleman; (2) that it executed against him alone; and (3) that no property of Joseph Eshleman was found with which to satisfy the judgment.

These requirements must be satisfied *before* VCMC may execute and levy on debtor's property to satisfy the debt.  As the Superior Court stated in characterizing § 4102:

> A creditor must first pursue collection from the spouse who received the necessity.  Only when that spouse's financial resources are insufficient to satisfy the debt may the other spouse's assets be subject to execution.

*Porter*, 718 A.2d at 826.

While VCMC did not require Joseph Eshleman to personally execute the residence agreement even though (we have determined) he was able to communicate

with others when he entered its skilled nursing care unit, Joseph Eshleman was the contracting party for purposes of § 4102.[2]

VCMC has not established that the above requirements of § 4102 are satisfied. To the contrary, it has failed to establish that even one of them is satisfied. The arbitration panel hearing the complaint of VCMC against issued an award on March 15, 2003, in favor of VCMC and against Joseph Eshleman and in favor of debtor and against VCMC. Shortly thereafter, VCMC appealed the award in favor of debtor. Further proceedings with respect to the appeal were automatically stayed when debtor filed her bankruptcy petition. This much is known about the arbitration proceeding.

VCMC, however, produced no evidence that the award in its favor and against Joseph Eshleman "ripened" into a judgment for purposes of § 4102. Without something more, we are not able to say whether it so qualified.

More importantly, VCMC produced no evidence whatsoever showing that it first executed on the judgment and sought to levy upon the assets of Joseph Eshleman – i.e., against "the spouse contracting the debt alone" – before seeking to recover from debtor. We have no basis for concluding that it did (or did not) do so.

Finally, even if the award against Joseph Eshleman did "ripen" into a judgment against him and VCMC executed and sought to levy upon his property, VCMC produced

---

[2] VCMC's reliance upon § 4102 would be a dud at the outset if debtor were considered to be the contracting party. For the doctrine of necessaries to apply, it must be the case that Joseph Eshleman contracted for the services VCMC provided and that, as his wife, debtor is only secondarily liable. If debtor is primarily liable, VCMC's claim would amount to a straightforward contract action. We have determined that such an action must fail.

no evidence establishing that no property of his was found upon which to levy to satisfy the judgment.

It follows from the foregoing that VCMC has failed to establish that it first sought to collect the debt from Joseph Eshleman before seeking to satisfy it from debtor's separate assets. As a consequence of this failure, we conclude that VCMC's reliance upon the doctrine of necessaries as codified at 23 Pa. C.S.A. § 4102 to recover the cost of Joseph Eshleman's care from debtor's separate assets must fail.

An appropriate order will be issued.

/s/
BERNARD MARKOVITZ
U.S. Bankruptcy Judge

Date: **June 13, 2007**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

IN RE:

| | | |
|---|---|---|
| **SUSAN H. ESHLEMAN,** | : | Bankruptcy No. 05-39306 BM |
| | : | |
| **Debtor** | : | Chapter 7 |

*******************************

| | | |
|---|---|---|
| **SUSAN H. ESHLEMAN,** | : | |
| | : | |
| **Movant** | : | |
| | : | |
| v. | : | Doc. # 38: Debtor's Objection |
| | : | To Claim No. 3 |
| **MASONIC VILLAGE AT SEWICKLEY,** | : | |
| a/k/a **VALLEY CARE MASONIC** | : | |
| **CENTER,** | : | |
| | : | |
| **Respondent** | : | |

## ORDER OF COURT

**AND NOW,** this **13th** day of **June**, 2007, for reasons set forth in the accompanying memorandum opinion, it hereby is **ORDERED**, **ADJUDGED** and **DECREED** that the objection of debtor Susan Eshleman to the proof of claim filed by Masonic Village at Sewickley, a/k/a Valley Care Masonic Center, be and hereby is **SUSTAINED**. The proof of claim be and hereby is **DISALLOWED**.

It is **SO ORDERED**.

                                                          **/s/**
                                          **BERNARD MARKOVITZ**
                                          U.S. Bankruptcy Judge

cm:  Debtor
       Mary Bower Sheats, Esquire
       Joel M. Helmrich, Esquire
       Quinn A. Johnson, Esquire
       Carlota M. Böhm, Esquire
       Office of United States Trustee